Chancery.

3bm478
d108 462

# Town of Bowlinggreen *vs* Hobson.

Error to the Warren Circuit.

Case 130.

May 26.

*Trustees of Towns.   Improvement of Towns.*

Judge Breck delivered the opinion of the Court.

A careful examination of the several statutes, bearing upon this case, brings us to the following conclusions:

The act of 1836 concerning the town of Bowlinggreen.
1st. That the "act concerning the Town of Bowlinggreen," of the 29th February, 1836, did not vest in the Trustees power and authority to cause any street or alley in said town to be paved or turnpiked at the cost and expense of the owners of lots fronting such street or alley, except upon the petition for that purpose, "of a majority of the owners of the ground, residing upon such street or alley, or of the owners of *the most* of the ground fronting upon such street or alley."

The act referred to gives the Trustees the same power and authority upon the subject which the 13th section of "an act to incorporate the town of Frankfort," passed 28th February, 1835, vested in the Trustees of Frankfort. There is some ambiguity in that section, which, we think, may have resulted from an error in the punctuation, making two sentences where there should have been but one; at any rate, we are of opinion that the proper construction of the whole provision does not vest in the Trustees authority and power to cause the streets or alleys to be improved at the cost and expense of the owners of the ground fronting them, except upon their application in the manner before stated.   In this branch of the case, there-

fore, we entirely concur in the views and construction of the Court below.

BOWLINGGREEN
*vs*
HOBSON.

2nd. The act of the 21st January, 1840, "further to regulate the duties of the Trustees of the Town of Bowlinggreen," so far as it has reference to the improvement of the streets of said town, by grading and McAdamizing, and otherwise, at the expense of the owners of the lots upon any such street, provides that "the Trustees shall also have power to cause any street in said town to be improved in like manner, (by grading and McAdamizing,) whenever two-thirds of the owners of lots in said street shall desire it, and shall levy a tax on each lot, agreeable to its front on said street, to defray the expenses of such improvement on said street."

The act of 1840, concerning the same.

It was the opinion of the Court below, that this provision, authorizing the Trustees to cause the improvement to be made, upon the application of two-thirds of the owners of lots upon the street, should control the action of the Trustees, and that, in effect, it superceded so much of the act of 1836, as made it the duty of the Trustees to proceed with the improvement upon the application therein prescribed. We should not be inclined to doubt the correctness of this construction, if the previous act had merely required application to be made by a *majority of the owners of lots* on the street sought to be improved. Under the act of 1836, in one instance, the Trustees were to act upon the *petition of a majority* of the owners of the ground, *residing* upon the street or alley, and in the second instance, upon the petition of the owners of *the most* of the ground fronting upon the street or alley. In the third instance, under the act of 1840, they were to act when desired by two-thirds of the owners of the lots upon the street; whether they resided upon the lot, as in the previous act, would be unimportant—nor does it necessarily follow that "the owners of two-thirds of the lots" would be "the owners of *the most* of the ground fronting upon the street." The act of 1840 presupposes that the lots fronting upon the street would vary in extent, and hence the provision that "*each lot* was to be taxed agreeable to its front on the street."

BOWLINGGREEN
vs
HOBSON.

The construction given to the acts of 1836 and 1840.

In the absence of any repealing clause in the act of 1840, as to the previous act, or other clause restricting the action of the Trustees to the application of two-thirds of the owners of the lots upon the street, to justify its improvement, we are not inclined to give it that construction, but to consider the Trustees as authorized to act when applied to or requested in either of the three modes prescribed.

The application to the Trustees for the improvement of streets in Bowlinggreen must be for the whole extent of the street, not a portion of it.

3d. That the *term* street, when used in the several acts, in reference to the improvement thereof, and to the petition or desire for the same, of the owners of the lots or ground thereon, means and includes the whole extent of such street, and consequently, that the trustees have no authority to cause only a portion of a street to be improved and to tax the owners of lots upon such portion with the expense.

The making out and furnishing to the Trustees of Bowlinggreen by Skiles, of a map of the proposed extension of the town limits over his land, was conclusive of his assent to such extension, and gave the trustees jurisdiction over it, without any conveyance.

4th. We are of opinion that no question necessarily arises in this case, under the act of 1839, "to extend the limits of the Town of Bowlinggreen," as *to the extent of* the powers of the Trustees in reference to the additional territory, embraced in the extended limits of the town under that act. So far as *Plain street* may have been opened and extended beyond the limits of the old town, into the new, we have no doubt as to the right of the Trustees to exercise control and jurisdiction over it as over other portions of the street. Such extension, it appears, was made by the proprietor of the land through which the street was extended, beyond the original limits of the town. Skiles, the proprietor of land adjoining the bounds of the old town, and within the limits of the new, as extended, laid off his land into lots, streets, &c. caused a plat thereof to be made, and delivered it to the Trustees. Plain street was thus extended through Skiles' land, and the part extended constituted a part of the section of Plain street which the trustees undertook to grade and McAdamize. A portion was within the limits of the old town adjoining, and within those limits were also the lots of the appellee. It is contended the Trustees had no jurisdiction over Plain street, beyond the original limits of the town, because Skiles had not conveyed to them the title. We think no formal conveyance, by deed, was

necessary. He laid off his land into lots and streets, and furnished the Trustees with a plat thereof. This was done after the act was passed extending the limits of the town, and after the ordinance of the Trustees extending the limits under the act, Under such circumstances, the streets laid out by Skiles, including Plain street extended, were in effect, dedicated by him to the use of the town and the public, and the Trustees had the same jurisdiction over them as over other streets. A parol dedication to public use, of a common or street, is valid, and that without being sanctioned by the use for any particular period of time. The law upon this subject, is very fully examined by the Supreme Court in the case of the *City of Cincinnati* vs *The lessee of White*, (6 *Peters*, 431.) But not only as to the streets, but as to the territory thus laid off into lots, subsequent to the passage of the act of 1840, and to the ordinance of the Trustees extending the limits; we think they, the Trustees, had jurisdiction as over the town within the original limits. We are also of opinion that, upon such an application as is required by law, from the owners of lots upon the whole of Plain street, including as well that portion of it which is outside of the original limits of the town, as that which is within, and only upon such an application would the Trustees be authorized to cause the street to be improved, and to levy a tax upon the lots upon the street to defray the expense.

It being admitted that the improvement in question was made upon a section only of said street, and without an application to the Trustees by the owners of lots upon the whole extent of the street, in either of the modes prescribed by the statutes, we are of opinion the Trustees had no authority to act, and that the tax levied upon the lots of the appellee, to defray a portion of the expense of the improvement, was unauthorized, and that there is no error in the decree of the Court perpetually injoining its collection.

The decree is, therefore, affirmed.

*Owsley & Goodloe* for plaintiff: *Underwood* for defendant.

3bm482.
103 258
3bm482
106 309
3bm482
118 520
e118 523
3bm 432
120 258

CHANCERY.

*Case* 131.

*May* 27.

Allegations of bill and answer.

# Hart *vs* Thompson's Adm'r. and Heirs.

### APPEAL FROM THE MADISON CIRCUIT.

### *Wills.   Executory devises:   Trustees and trusts.*

CHIEF JUSTICE EWING delivered the opinion of the Court.—JUDGE BRECK did not sit in this case.

THIS case grows out of and is based upon the decision of this Court, affirming the decision of the Circuit Court, in the case of *Keziah Thompson* vs *Peebles' heirs et al.* in which said Hart had filed a cross bill. That decision will be found reported in 6 *Dana,* 387, in which a history of many of the facts involved in this case will be seen.

After the termination of that case, Nathaniel Hart filed his bill against the heirs and administrator of Lawrence Thompson and of Keziah Thompson, both of whom had died, the former some two years before the latter, asking first a rescission of the contract by which the 400 acres of land claimed by Peebles' heirs, was conveyed to him, and a restitution of his consideration, with interest and costs.  Secondly, if he was not entitled to that, damages for a breach of the warranty, and payment of the same to him out of the proceeds of the slaves and their descendants, which had been conveyed by him in trust for the benefit of his sister, Keziah Thompson, exclusive of her husband, and the trustee, being her son, had died some ten years before his mother ; also out of the proceeds of two hundred acres of land, which he charges belonged to L. and K. Thompson, and which they died possessed of, and some small amount of personal estate; all of which slaves, land and personalty, had been sold, and the proceeds in part paid over to the heirs, and the residue was in the hands of the purchaser's administrator and commissioner, who sold the slaves for the purpose of a division, and which he injoins, charging that some of the heirs were insolvent, and some had left the State, &c. The heirs answer, controverting in every respect, his

right to recover, and claiming the entire estate, as heirs of their mother, Keziah Thompson, and not as heirs of their father, L. Thompson, who they charge died insolvent.

The Circuit Court, upon the hearing, dismissed the complainant's bill, and he has appealed to this Court.

For the reasons given by the Court below, the most of which we approve, and for many others which might be given, we think that the bill was properly dismissed.

In the event of a rescission of the contract only, can Mrs. Thompson's estate be rendered liable to refund? The deeds not having been acknowledged so as to pass her title, or be binding upon her, cannot be construed so as to impose a covenant of warranty upon her, if even such covenant might be obligatory, had the deed been properly acknowledged. And we think no good ground for a rescission has been made out. There is no misrepresentation or concealment pretended. The complainant was well apprized of the true state and condition of the title of the land which he contracted for.

The relation which he occupied, as the surviving executor, and "overseer" of the estate of his deceased father, with power to "sell so much of the personalty or realty, as shall be sufficient to pay off all just debts, as well as all the expenses that shall be necessary towards *securing* the several tracts of land claimed by the testator, either by settlement, pre-emption, entry, *purchase* or otherwise, &c." and also with power to allot to each of the testator's children, as they came of age or married, certain articles of personal property, as well as "a good tract of land not to exceed one thousand acres," made it his especial duty to look into and understand the true condition of the land claims, whether acquired by *purchase* or otherwise, and to take the necessary steps for the settlement and security of the titles. His attitude and his duties required that he should have been much better acquainted with the true state and condition of the land purchased, as well as of the title to it, than his sister, and we must presume that he was much better acquainted with both. He also had the deeds in his possession, and was well acquainted with all the facts in relation to

the time, manner and form of the acknowledgments, and of the recording of the deeds. Again, it was more especially the duty of the complainant, as the executor of the estate, with the power to allot to each of the children a good tract of land, to see that equal justice was done to all; yet in the allotment of 1809, the tract which had been previously sold to Peebles by the reckless husband of his sister, was allotted to her, and the whole burthen of the controversy with Peebles' heirs thrown upon her, which devolved upon and should have been equally borne by all the devisees, and have been more especially attended to and cleared of the incumbrance, by the complainant, who was the executor and "overseer" of the estate, with the powers before alluded to. Again, with a full knowledge of all the facts, and a perfect acquaintance with the necessitous condition of his sister, a few years after the allotment, he purchased from her the same tract which had been thrown upon her in the division, at less than one third of the amount at which it had been set apart to her, and at about one fifteenth or twentieth part of its subsequently increased value, free from the incumbrance. Though the acknowledgments and recording of the deeds were irregular, he seems never, in his sister's lifetime, to have made any effort to have them corrected, nor can we presume that she would have refused to do so, had application been made to her; and indeed we have evidence to believe, that she would not have refused, from the fact that she signed and acknowledged two deeds to the complainant. Besides, he relied upon and availed himself of the deeds in the prosecution of the suit against Peebles' heirs, and seems not to have been obstructed in the lower Court, by reason of any defect in the authentication of the deeds, but his suit was dismissed there, *without prejudice,* upon other grounds, which upon the exercise of proper diligence upon his part, in bringing the proper parties before the Court, and preparing the case, might have been obviated, and perhaps the ultimate right, after the death of Lawrence Thompson, might have been secured. Though this Court, in the opinion delivered, gave various reasons for the affirmance, they could not do more than affirm the decree as made.

HART
*vs*
THOMPSON'S AD.
AND HEIRS.

Again, had the complainant, as the executor and "over-seer" of the estate, as it was his duty to do, instituted the suit in proper time, and in the names of the proper parties, instead of delaying, and afterwards, by the allot-ment, throwing the whole burthen of the controversy upon his sister, in all reasonable likelihood the land might have been recovered. Be this as it may, in view of all the foregoing considerations, and after the complainant has lost the suit, and that too perhaps by his own negligence, and has failed to reap the benefit of his enormous specu-lation, we cannot indulge him, after a lapse of more than twenty years, to come into a Court of equity and ask a rescission of the contract, and a restitution of the little pittance which he secured to her, it being almost the only remnant which she has been able to realize as her share of the large patrimony left her by her deceased parent, if the 200 acres upon which she died be taken from her or her heirs, as the property of her husband, which the com-plainant seeks to do by his bill in this case.

If it were conceded that a proceeding in Chancery might be tolerated for a breach of the warranty of Law-rence Thompson, which, from the foregoing suggestions is certainly to be greatly questioned, such proceedings could only be made to reach his estate, descended to or distributed among *his* heirs, and not the estate which they derived from their mother. He and his wife died possessed of the aforesaid two hundred acres of land, which originally belonged to her father, and the title to which was perfected by grant to her and his other chil-dren and heirs, more than forty-five years ago. Lawrence Thompson and wife settled on the tract upwards of forty years ago, and it was generally reputed and believed to belong to Mrs. Thompson, and her husband was reputed to be insolvent and to own nothing out of which a debt could be made, for many years before his death. From these facts the possession would be regarded as held under her title, and would enure to its support and effec-tuation, and ripen and mature it into a valid title in her, unless it can be shown that her husband held a valid title to the same. This has been attempted by the exhibition of the will of Simpson Hart, who was one of the devi-

*The heirs of the wife are not lia-ble out of estate descended thro' the mother, to make good the warranty of the father.*

HART
*vs*
THOMPSON'S AD.
AND HEIRS.

Simpson Hart's
will.

sees of her father, Nathaniel Hart, Sr. deceased, who died in 1788, a few years after the death of his father, a single man and without issue. By his will he made the following devise: "Whereas I have sold unto my brother-in-law, Lawrence Thompson, my right to one thousand acres of land lying in the district of Kentucky, which my father left me in his last will and testament, which said land was to be of my own choosing—my will and desire is, that agreeably to my contract with said Thompson, he shall have, of his own choosing, said one thousand acres of land." By the division of 1809, before referred to, there was allotted to the *"heirs* and devisees" of Simpson Hart, deceased, seven hundred acres in Madison, Boonsborough, with this reservation in the agreement of division, signed by the devisees: "It is understood that Nathaniel Hart reserves all claim which he may have *under his father's will,* in the part allotted to Simpson Hart's heirs and devisees;" and *it is* proven by John Hart, that the complainant, Nathaniel Hart, always refused to recognize the will of Simpson Hart. Yet it is contended by his counsel, that Lawrence Thompson held the title to the two hundred acres of land in question, under the will of Simpson Hart, deceased, and seeks to subject it as his land thus devised.

Nathaniel Hart,
Sen's will.

The will of Nathaniel Hart, Sr. deceased, under which Simpson Hart claims, contains this clause: "My will and desire is, that all my estate, both real and personal, be equally divided amongst my said nine children, then living, or their lawful heirs if dead, and if either of my nine children should *die without heirs of their body, lawfully begotten,* that *their part,* so *allotted and given them* as aforesaid, be *equally divided amongst my other children* THEN LIVING."

It is contended under this clause of the will, that the devise to Simpson Hart, as well as the other devises, was the devise of a fee tail estate, which by our statute, (1 *Stat. Law,* 442,) is converted into a fee simple estate, and the conditions annexed thereto, restraining alienation, are abrogated, and Simpson Hart became invested with a pure and absolute fee, with the power of unlimited dis-

position of the estate as such. We cannot sanction this position.

We are aware that the English Courts have gone great lengths in construing the language of a devise into the creation of an estate tail. Their policy and the genius of their government impells them to this construction, as the means of securing landed estate to the eldest son and his issue, sustaining family settlements and proping up their nobility. The policy and genius of our government dictates a different construction, or they allow that construction which approaches nearest to the intention of the testator, which should be the governing consideration in the interpretation of all wills, as well of the realty as of the personalty. But according to the strictest rule of English interpretation, we cannot regard the devise in question as a limitation over, after an indefinite failure of issue, which would constitute it an estate tail, but as a limitation over upon a fee, which vests the estate in the surviving children, upon the death of either without *issue living* at his or her death, and is good as an executory devise.

The words "to be divided among my other children *then living*," shows that the testator looked to a definite period when the contingency, "the death without lawful heirs," was to happen, namely, whilst his other children were *then living*, and not to an indefinite failure of heirs of his body, and brings the case within the distinction taken in the case of *Pells* vs *Brown*, (*Cro. Jac.* 590;) *Porter* vs *Bradley*, (3 *Term Rep.* 143;) *Roe* vs *Jeffrey*, (7 *Term Rep.* 588;) *Fosdick* vs *Cornell*, (1 *John. Rep.* 439;) *Anderson* vs *Jackson*, (16 *John. Rep.* 382;) (1 *P. Williams*, 534;) *Jackson* vs *Blanshan*, (3 *John. Rep.* 289;) *Moffett* vs *Strong*, (10 *John. Rep.* 12;) *Jackson* vs *Staats*, (11 *John. Rep.* 337.) Although the authority of the foregoing cases is questioned by Chancellor Kent, in a very learned opinion, delivered in the latter case, in which he and others of the Court dissent from the majority, we think that the principle of those cases at least is consistent with the policy and genius of our government, and whenever, as in the case before us, there is a clear indication of an intention on the part of the devisor to

HART
*vs*
THOMPSON'S AD.
AND HEIRS.

A devise to all the testator's children to be equally divided, "but should either die without heirs of their body lawfully begotten, that their part so allotted and given to them as aforesaid, to be equally divided amongst my other children then living," is good as an executory devise, & upon the death of either child without issue, vests in the surviving children.

HART
vs
THOMPSON'S AD.
AND HEIRS.

pass a defeasible fee only to the first devisee, with a limitation over to others, *then living*, at the death of the first devisee without issue or heirs of his body, so as to preserve the estate to his children, that such construction should be given to the devise as to carry out the object and intention of the devisor, and effectuate the purpose of the devise. This alone can be done by giving force and effect to it as an executory devise, limited upon a fee, which is to terminate at the death of the first devisee, without issue living at the time of his *death*. And the more especially should this interpretation be given, since the enactment of our statute abolishing entails, and the conditions annexed to the fee; as by a different construction the most beneficent intention of the devisor might be wholly frustrated and defeated. While the English Courts in a doubtful case, consistently with the policy of their government, might feel authorized to construe the devise into an entail, we, in a doubtful case, would feel authorized to give such construction to the devise as would carry out the intention of the devisor, and give effect to the devise according to such intention.

We think, therefore, that the estate of Simpson Hart terminated at his death, without issue living, and that no estate passed to Lawrence Thompson by the devise to him. Consequently, that he had no title to the land in question, other than as tenant by the courtesy, and his heirs derived no title from him, which can be subjected to the payment of the complainant's demand.

Nor can the complainant subject the slaves, claimed by the heirs, to the payment of his demand. The heirs derived their title to them also, from their mother, and not from their father, and if they could be subjected to the payment of any debt owing by their father, they most unquestionably cannot be subjected to the complainant's demand against them. All the slaves were those and their descendants that were conveyed by the complainant himself to a son of Mrs. Thompson, in trust for her sole and separate use during her life, and at her death, to go and descend to such person or persons as she might direct. Her husband never had any interest in them; and the complainant cannot be allowed, against the express terms

Slaves purchased with the land devised to the wife and conveyed in trust to her and to her appointee at her death, pass to her heirs not the heirs of her husband, nor are they liable for his debts—and if the trustee die the Chancellor will treat the husband as trustee for the benefit of the wife.

of his own deed, to set up claim to them as the property of Lawrence Thompson, or to subject them to the payment of a demand against him. The death of the trustee can make no difference. The estate in the slaves will not be allowed by the Chancellor to devolve upon the wife, so as to make them the property of the husband. The Chancellor might and would, upon application, have appointed a trustee to sustain and carry out the objects of the trust, and none having been appointed, would treat the husband as trustee, holding the estate for the exclusive use and benefit of his wife, and would not have permitted him to apply it to his own use, or the payment of his own debts; much less will the Chancellor permit the complainant, against the provisions of his own deed, to apply it to the satisfaction of his demand against the husband. It matters not as to the complainant's demand, whether the deed was recorded or not. He was well apprised of its existence, its character, and object, and will not be allowed, as complainant, to defeat its operation and purpose.

ALLEN &c.
*vs*
SUMMERS &c.

*Turner* for appellant: *Owsley & Goodloe and Caperton* for appellees.